FILED

MAY 2 0 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTOPHER MICHAEL POPE,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,
Defendant.

CV 10-6019-PK

FINDINGS AND
RECOMMENDATION

PAPAK, Magistrate Judge:

Plaintiff Christopher Pope filed this action on January 19, 2010 seeking judicial review of

a final decision of the Commissioner of Social Security finding him not disabled and not entitled

to disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This

court has jurisdiction over Pope's action pursuant to 42 U.S.C. § 405(g). Pope argues that the

Commissioner erred by not finding his impairment of chronic insomnia to be severe, by rejecting

the opinion of Pope's pain specialist Dr. Morris that Pope is disabled, by discrediting the

FINDINGS AND RECOMMENDATION- Page 1

opinions of examining psychologist Dr. Northway, by rejecting the testimony of Pope and his

mother, and by relying on testimony from a vocational expert that was inconsistent with the

*Dictionary of Occupational Titles.* The Commissioner generally concedes error, but argues that

remand for further proceedings is necessary to assess Pope's alleged insomnia and determine

how that condition effects Pope's residual functional capacity. Thus, the only remaining issue

before this court is whether to remand for further proceedings or for a finding of disability and

calculation of benefits. I have considered all of the parties' briefs and all of the evidence in the

administrative record. For the reasons set forth below, the Commissioner's decision should be

reversed and remanded for further proceedings consistent with this opinion.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected . . . to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has

established a five-step sequential process for determining whether a claimant has made the

requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§

404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only

at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v.

Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if

any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i). If the ALJ finds that

the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.

*See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).  Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record.  *See* 20 C.F.R. §§ 404.1520(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical

and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c). If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

FINDINGS AND RECOMMENDATION- Page 4

national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at

142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant

will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step.

*See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing

Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v.

Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence

may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d

747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Plaintiff Christopher Pope was born on December 30, 1980, and is now 30 years old. Tr.

129. From 1999 through April 28, 2006, Pope worked at a mill operating a machine that made

FINDINGS AND RECOMMENDATION- Page 5

beams. Tr.142. On September 14, 2006, Pope filed an application for DIB benefits alleging

disability beginning April 28, 2006. Tr. 13. Pope listed fibromyalgia and "mild facial

syndrome"[2] as illnesses, and asserted that they caused daily chronic pain, chronic fatigue,

insomnia, and decreased physical abilities. Tr. 141. Pope's claim was denied initially and on

reconsideration. Tr. 73, 74. Two separate hearings were held by Administrative Law Judge

(ALJ) John Madden, Jr., the first on February 24, 2009, and the second on August 13, 2009. Tr.

33-47, 48-72. On August 25, 2009, the ALJ issued a decision finding Pope not disabled. Tr. 13-

27. The Appeals Council declined review. Tr. 2. Pope then commenced this action.

## I.    Medical History

Pope has struggled with chronic pain and associated sleep problems since at least 2005.

On March 17, 2005, Pope visited his primary care physician, Dr. Skaggs, complaining of chronic

neck, back, and shoulder pain, which he had been experiencing for several years. Tr. 274. Pope

noted that the pain first arose after he was involved in two motor vehicle accidents eight or nine

years earlier. *Id.* In the more severe of those accidents, Pope's head apparently struck the

windshield of a truck in which he was the passenger, causing him to lose consciousness for

several minutes. Tr. 618. Pope went to the emergency room, but was released that same day.

*Id.* After the accidents Pope experienced headaches, muscle spasms, memory problems, anxiety,

and other cognitive changes. Tr. 619. About six months after the accidents, in January 1999, a

psychologist examined Pope and diagnosed post-concussion syndrome and adjustment disorder

with anxiety features. Tr. 622-623. The psychologist opined that Pope had persistent but mild

cognitive difficulties which would likely improve over time. *Id.*

---

[2] Pope apparently meant "myofascial" pain syndrome, a chronic form of muscle pain.

FINDINGS AND RECOMMENDATION- Page 6

In March and April 2005, Pope saw Dr. Skaggs several more times, without gaining much insight into the cause of his pain. Several lab tests to determine the presence of a rheumatoid condition were negative, while one was positive, and spine x-rays were normal. Tr. 269-273, 275-276. Pope took several weeks off from work, but the pain did not improve. Tr. 267-268. Pope also visited a rheumatologist, who thought there was a 95% chance Pope had ankylosing spondylitis, an autoimmune condition. Tr. 263. However, in June 2005, after a normal MRI, the rheumatologist retracted his diagnosis, instead suggesting that Pope had fibromyalgia. Tr. 258.

Pope first reported problems sleeping in late June 2005. On June 27, 2005, he told a nurse practitioner that he could not sleep because he could not get comfortable. Tr. 396. On July 9, 2005, he reported to his new primary care physician, Dr. Floyd, that he was unable to sleep at night and suffered an irregular heart beat, shakiness, vision problems, and what he described as a "cloud" in his head. Tr. 393. Dr. Floyd suspected that Pope's complaints were emotionally based and prescribed medication for depression. *Id.* On July 11, 2005, Pope visited a neurologist, stating that he woke up within two hours of falling asleep and could not fall back to sleep. Tr. 285. Pope also described intermittent headaches, anxiety, and problems with cognition. Tr. 285-286. The neurologist suspected that Pope's insomnia was caused by an underlying metabolic disorder, such as hyperthyroidism. Tr. 287. On July 20, 2005, Pope reported to Dr. Floyd that he was still unable to sleep; Dr. Floyd diagnosed insomnia and a potential anxiety disorder, and prescribed medication for depression. Tr. 391. The next week, Pope again reported being unable to sleep and additionally stated that he had trouble concentrating and solving problems. Tr. 389. Dr. Floyd continued to attribute Pope's symptoms to depression, and prescribed a different anti-depressant. *Id.* Nevertheless, Pope found the

depression medication ineffective, and continued to have difficulty sleeping. Tr. 387, 388.

Over the next several months, Pope's sleep fluctuated. On August 16, 2005, Pope reported that he was getting a good night of sleep only one in three nights. Tr. 386. On September 9, 2005, however, he reported that he had been able to sleep four nights in a row with the assistance of Klonopin and Trazodone. Tr. 385. On October, 5, 2005, Pope visited Dr. Irbe, a sleep specialist, reporting that in the last three week period he "didn't sleep at all" and was like "a walking Zombie." Tr. 306. Pope stated that he had lost over twenty pounds during that period. Tr. 307. Dr. Irbe recommended Pope improve his sleep behaviors, change the dosages of his medication, and use Ambien in the middle of the night when he awoke. Tr. 307-308. Two weeks later, Pope returned to Dr. Irbe reporting that his insomnia had worsened, causing him to feel sick and run down. Tr. 304. Although Dr. Irbe experimented with different medications, Pope was still able to sleep less than two hours per night and complained of severe headaches and fatigue. Tr. 303. After Dr. Irbe prescribed Valium, however, Pope reported being able to sleep seven to eight hours a night. *Id.*

Pope's condition remained relatively stable until late April 2006 when he had an accident riding his all-terrain vehicle (ATV) and hit his head in the sand. Tr. 379. In the first week of May 2006, Pope went to the urgent care and then the emergency room reporting pain in his back and shoulder. Tr. 294-295, 322-323. Pope experienced no improvement over the next week, despite that x-rays and bone imaging showed no abnormalities. Tr. 374, 377. On June 1, 2006, Pope visited Dr. Floyd reporting that he had pain in his back and shoulder and had not slept in four nights. Tr. 372. Dr. Floyd observed a "very dramatic pain demonstration," with Pope laying over the exam table holding his arm against his waist. *Id.* Dr. Floyd also noted that Pope looked

very tired and had dark circles under his eyes.  *Id.*   On June 9, 2006, an MRI revealed a tear in the anterior inferior labrum of Pope's left shoulder, but showed no abnormalities in his pelvis. Tr. 369.   Several days later, Dr. Floyd diagnosed a left shoulder labral tear accounting for the symptoms in Pope's shoulder.  Tr. 366.  Near the end of June, however, an orthopedist opined that Pope's pain was dramatically out of proportion to the MRI findings and the reported ATV accident, and suggested that the pain resulted from a rheumatological condition. Tr. 309.  Pope also returned to Dr. Irbe, complaining of chronic pain at night which exacerbated his insomnia. Tr. 302.

In the beginning of July 2006, Pope's health deteriorated rapidly, but medical professionals could not determine the reason for the decline.  On July 9, 2006, Pope went to the emergency room and stated that he felt like he was dying after not having slept for six consecutive days.  Tr. 313.  Pope reported losing 20 pounds over the past month and listed a number of other symptoms, including nausea, intermittent vomiting, diarrhea, cough, chest pains, dark urine, and abdominal pains.  *Id.*  X-rays and scans were normal, and physical examination revealed nothing to explain Pope's symptoms.  Tr. 314-315.  Although Pope denied feeling depressed, the doctor wrote: "I strongly suspect there is a significant underlying depression or perhaps another psychiatric illness that may be causing this present symptomatology."  Tr. 315. Pope's mother insisting that he be admitted to the hospital to determine the cause of his symptoms, stating that she did not feel she could  care for him any longer.  *Id.*  The hospital refused, citing the lack of "a clear need for hospitalization at this time."  *Id.*   The next day, Pope returned to Dr. Floyd complaining of insomnia, vomiting, incontinence, migraines, pain, and feeling depressed and scared.  Tr. 361-362.  Dr. Floyd noted that Pope looked paler and thinner

than normal, with an "almost chronically ill appearance." *Id.* Dr. Floyd reiterated that he had no

clear diagnosis for Pope's condition and prescribed morphine to help Pope sleep. Tr. 363. A

brain CT scan returned normal results but Pope continued to report severe pain and insomnia.

Tr. 360. A week later, on July 20, 2006, Pope reported to another primary care physician, Dr.

Allcott, that he had not slept for five nights in a row and still had migraines, vomiting, and

shoulder pain. Tr. 352. Pope continued to report poor sleep through the end of July and August

2006. Tr. 347, 350.

On September 1, 2006, Pope visited Dr. Baker at the OHSU Rheumatology Clinic. Tr.

333-338. Pope complained of chronic pain, headaches, difficulty focusing, short-term memory

loss, and an unintentional 30 pound weight loss. Tr. 333. He also reported that he slept only

two or three nights per week. Tr. 338. Dr. Baker found no evidence of an underlying

inflammatory arthritis or systemic autoimmune disease, and proposed chronic myofascial pain or

fibromyalgia as the most likely diagnoses. Tr. 334. At a visit to Dr. Floyd near the end of the

month, Pope reported some improvement with his pain and sleeping. Tr. 346.

Function reports completed by Pope and his mother in October 2006 describe an

unpredictable illness causing pain and wide-ranging physical and cognitive effects. Pope reported

being constantly in pain, with varying levels of severity, which was exacerbated by activity. Tr.

171. To control the pain, Pope took Ibuprofen, Oxycontin, and Diazepam. Tr. 172. Pope wrote

that he did not usually prepare his own food, except for breakfast when his arms would allow.

Tr. 152. He sometimes worked on his car and drove it, but not when pain in his shoulders or

arms interfered. Tr. 153. He could walk only 100 yard before needing to rest. Tr. 155. Pope

also reported needing help to wash his hair, eat, drink, and get up and down; anything involving

FINDINGS AND RECOMMENDATION- Page 10

use of his arms required assistance. Tr. 168. Overall, his physical abilities depended on his current level of pain. Tr. 169. Some days he could not be active at all, some days he could tolerate minimal activity for one or two hours, and rarely he could stay active for around four hours. Tr. 167. Cognitively, Pope reported difficulty focusing, organizing, concentrating, and remembering. Tr. 155, 168. He had difficulty handling stress, being in social environments and handling money. Tr. 153, 156. Pope's mother described similar symptoms, varying in severity day by day. Tr. 179. According to her, some days Pope would not sleep at all. Tr. 174. On bad days, Pope could not do anything and would even need help dressing himself. Tr. 174, 175. On good days, Pope could walk from the trailer where he stayed to the house, use the restroom, eat breakfast, and spend time with his father at home. Tr. 174. Pope had terrible problems with memory and organizational skills and could not adequately handle his own finances. Tr. 176, 178. He had difficulty following written instructions, but could do better with someone assisting him. Tr. 180.

In late October 2006, Pope continued to report the interconnected problems of pain, sleeplessness, and fatigue. On October 20, 2006, Pope told Dr. Floyd that his constant pain was the most consistent problem for his sleep cycle, which left him fatigued during the day. Tr. 585. On October 25, 2006, Pope visited Dr. Morris, a pain management specialist, for an initial consultation. Tr. 399-405. Dr. Morris found 17 of 18 fibromyalgia trigger points present, with none of the control points present.[3] Tr. 402. Pope reported pain at the level of 8.5 out of ten and

_____

[3] Dr. Morris performed a trigger point exam every time Pope subsequently came for treatment, except for May 17, 2007, when it is unclear from progress notes whether that examination occurred. Tr. 488. On all of the trigger point examinations except one, Dr. Morris found at least 11 out of 18 trigger points present with no control points present. Tr. 552 (Examination on October 12, 2007 revealed 10 out of 18 trigger points). These trigger point

FINDINGS AND RECOMMENDATION- Page 11

stated the he slept four hours per night. Tr. 401, 402. Dr. Morris described Pope's condition as

intractable pain related to fibromyalgia complicated by anxiety, sleep disorder, and medication

sensitivity. *Id.* Dr. Morris wrote that Pope had "not found an adequate solution to his pain

problem and has become completely disabled by his symptoms." *Id.* Dr. Morris described

Pope's current condition as "medically disabling" but noted that "[i]mprovement in condition is

expected and return to work may be considered in 18 months." Tr. 403. Dr. Morris sketched a

treatment plan including Seroquel and cranial stimulation for sleep, opioid therapy for chronic

pain, as well as referrals for physical therapy, massage therapy, acupuncture, psychology,

biofeedback, and psychiatry. Tr. 403-404.

     In December 2006, Disability Determination Services referred Pope for a

psychodiagnostic assessment with David Northway, Ph.D., mainly focusing on depression. Tr.

412-418. Pope generally reported severe insomnia causing cognitive problems, anxiety about his

physical problems, and weight loss. Tr. 412. He described taking two to three hours to fall

asleep on two or three nights a week, and not sleeping at all the other nights. Tr. 414. Overall,

Pope estimated sleeping only eight to 10 hours in a typical week. *Id.* None of the sleep

medications he tried had been helpful. *Id.* His sleeping problems had been severe for two years

and he believed that being sleep-deprived led to cognitive problems and anxiety. *Id.* Dr.

Northway commented: "Mr. Pope reports he sleeps only eight to 10 hours a week, which seems

---

examination results comport with the American College of Rheumatology's diagnostic criteria
for fibromyalgia, which are: 1) patient reports of a history of pain in all four quadrants of the
body, as well as axial skeletal pain, for a period of at least three months; and 2) patient reports of
pain in at least eleven of eighteen points upon digital palpitation. *See Jordan v. Northrop
Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004).

somewhat difficult to believe yet it [is] potentially possible. He should be observed in a sleep

disorder clinic overnight to get some sense of whether this is accurate reporting." Tr. 415-416.

Dr. Northway also opined that Pope's sleep issues might be related to Bipolar Disorder, and

encouraged Pope to have a psychiatric evaluation to determine if other medications might be

helpful. Tr. 416.

Dr. Northway's assessment also focused on Pope's cognitive abilities. He noted that

Pope performed reasonably well on most tasks, but demonstrated some attentional difficulties

and problems coding material. Tr. 416. Overall, Dr. Northway described some problems with

immediate attention and concentration secondary to anxiety, which interfered with Pope's ability

to attend. *Id.* Pope's deficits, however, did not seem to reflect organic impairment, although Dr.

Northway recommended further neuropsychological testing to clarify the source of the deficits.

*Id.* Dr. Northway also noted that Pope seemed withdrawn and depressed and that his anxiety

about his physical condition was apparent. *Id.* Consequently, Dr. Northway diagnosed Pope

with Rule out Somatization Disorder, Dysthmic Disorder, Rule out Bipolar I Disorder,

Adjustment Disorder with anxiety in reaction to his perceived physical problems and chronic

insomnia. Tr. 417.

Over the next several months, Pope engaged in counseling, biofeedback therapy and

returned frequently to Dr. Morris for pain management and Dr. Irbe for sleep treatment, but

continued to suffer from insomnia. On December 15, 2006, he reported sleeping three to four

hours a night and experienced pain at eight out of ten. Tr. 441. Dr. Morris recommended Pope

switch from Oxycontin to Methadone for pain control. *Id.* On December 27, 2006, Pope

reported to his counselor, Scott Pengelly, Ph.D., that he had slept well the last two nights, making

FINDINGS AND RECOMMENDATION- Page 13

it easier for him to track conversations and enhancing his overall sense of well-being. Tr. 600. On December 28, 2006, however, Pope visited Dr. Irbe complaining that his insomnia and pain had not improved since his prior visit. Tr. 576. Pope described that he slept only 10 to 12 hours a week, that it took him one or two hours to fall asleep, that sleep does not leave him feeling refreshed, and that on some nights he did not sleep at all. *Id.* Pope reiterated that his lack of sleep significantly affected his daytime cognition and alertness and described "brain fog" causing difficulty carrying on conversations and executive higher cognitive tasks. *Id.* Dr. Irbe increased Pope's prescription of Valium to improve sleep onset and recommended a sleep study to rule out a sleep disorder and to quantify the amount Pope was actually sleeping. *Id.* On January 11, 2007, Pope reported getting between zero and eight hours of non-restorative sleep and pain of seven out of 10. Tr. 432, 434.

Dr. Irbe's sleep study on January 15, 2007 mostly confirmed Pope's informal reports. Lights were turned off at 11:00 PM, Pope fell asleep at 1:00 PM and awoke at 6:00 PM. Tr. 575. The study found "sleep onset insomnia, normal volume of REM sleep, paucity of deep sleep and 16% of stage 1 NREM sleep." Tr. 575. From these results, Dr. Irbe opined that Pope's sleep architecture indicated sleep onset insomnia and an absence of deep sleep reflecting the effects of Valium. Tr. 574. In summary, she concluded that the study "failed to demonstrate treatable sleep disorders other than primary sleep onset insomnia" and prescribed Lyrica to improve Pope's sleep onset latency. *Id.*

Over the next year, Pope's pain and insomnia continued to fluctuate. On February 9, 2007, Pope's progress note stated that methadone was not providing any pain relief and that he had not slept in a week. Tr. 428. Another entry in the same note indicated that Pope was getting

FINDINGS AND RECOMMENDATION- Page 14

five hours of non-restorative sleep a night.   Tr. 429.   Dr. Morris switched Pope from methadone to a Fentanyl patch for pain.   Tr. 430.   By February 23, 2007, the fentanyl patch improved Pope's pain and allowed him to get sleep more often.   Tr. 425-427.   On March 15, 2007, Pope again told Dr. Morris that Fentanyl was somewhat helpful in decreasing pain, but also reported severe insomnia and zero to four hours of non-restorative sleep.   Tr. 500.   Dr. Morris wrote that Pope "still has severe insomnia at night, however, and despite Dr. Irbe's best efforts, has not found a successful remedy." *Id.*   A week later, Pope visited Dr. Morris and reported that he stopped using Fentanyl several days earlier and that his pain had worsened to 10 out of 10.   Tr. 496, 498.   Dr. Morris prescribed Suboxone for Pope.   Tr. 498.   On April 18, 2007, Pope described increased pain and pain flairs.   Tr. 490.   He also reported getting two to three hours of non-restorative sleep nightly.   Tr. 491.   Dr. Morris encouraged Pope to ask Dr. Irbe what medications could be employed to enable him to get refreshing sleep.   Tr. 493.

On May 16, 2007, Pope visited Dr. Irbe and reported sleeping better since starting Suboxone.   Tr. 573.   Dr. Irbe noted that Pope had appropriate sleep hygiene, but recommended continuing sleep-wake behavioral modification, exercise, and Valium, with reevaluation as needed in six to 12 months. *Id.*   Dr. Irbe also wrote: "I doubt that a trial with different sleeping agents at this point would improve his sleep pattern.   As you know in the past all traditional and non-traditional sleeping agents have failed except Valium 20 mg h.s." *Id.*   The next day, however, Pope visited Dr. Morris reporting that Suboxone was not helping his pain, with migraine pain occurring upon waking in the morning, subsiding in the afternoon, and resuming in the evening.   Tr. 486.   He estimated his pain at eight or nine out of 10.   Tr. 488.   Pope noted, however, that his mood, energy, and sleep had improved somewhat on Suboxone, allowing him

six to eight hours of non-restorative sleep. Tr. 486, 488. Despite these problems with pain and sleep, Pope reported working on a car for a relative to earn a little money. Tr. 487. Dr. Morris took Pope off of Suboxone. Tr. 489.

On May 30, 2007, however, Pope reported to Dr. Morris that he had continued with Suboxone because he was going to the coast to ride his quad. Tr. 482. Pope then decided to discontinue Suboxone three days before his appointment. *Id.* Dr. Morris restarted Pope on methadone. Tr. 485. A month later, on June 29, 2007, Pope stated that he was getting better pain relief on methadone than Suboxone and also that his sleep was good. Tr. 478. In fact, he reported six to eight hours of restorative sleep per night. Tr. 479. Pope also started taking two computer classes at the local community college, although he received special accommodations including extended time for testing, early notification and additional time for assignments, audio recordings of classes, and a note taker. Tr. 243, 250, 479. On July 31, 2007, Pope reported getting eight hours of restorative sleep per night, although he continued to wake up during the night with pain. Tr. 568, 570. On August 28, 2007, Pope returned to Dr. Morris reporting that pain flare-ups had prevented him from taking his finals at school. Tr. 563. Pope reported eight hours of non-restorative sleep and Dr. Morris prescribed Tizanidine for bedtime. Tr. 564, 565.

On September 14, 2007, Pope complained of poor sleep due to shoulder and back pain, reporting six hours of broken, non-restorative sleep per night. Tr. 559, 561. Pope also registered for two more computer programming classes at the community college. Tr. 250, 599. On September 28, 2007, Pope again reported poor sleep, perhaps due to the changing weather, and complained of not getting pain relief at night. Tr. 554. He estimated his pain at 10 out of 10.

Pope declined trigger point injections and Dr. Morris increased his bedtime methadone dosage. Tr. 557. On October 12, 2007, Pope reported pain of seven to eight out of 10 and noted that his sleeping had improved with increased methadone. Tr. 550. Dr. Morris increased Pope's morning methadone dose. Tr. 553. On October 26, 2007, Pope again reported improvement with his pain, estimating the pain at seven out of 10, and Dr. Morris increased his noon methadone dose. Tr. 545, 547, 548. On November 21, 2007, Pope reported worse pain, causing him to miss three days of school. Tr. 540. Pope also admitted using marijuana, provided by his father who has a medical marijuana card, to encourage sleep. Tr. 543. Dr. Morris warned that he would not prescribe methadone if Pope continued to use marijuana, but increased Pope's methadone dose. *Id.* The next month, on December 21, 2007, Pope reported an improvement in his pain and sleeping, attributed to the increase in methadone. Tr. 535.

Over the next several months, however, Pope's pain worsened, despite ever-increasing doses of methadone. On January 29, 2008, Pope described being nauseated with high pain levels and experiencing pain during his back-to-back classes. Tr. 530. On February 21, 2008, Pope stated that his pain was flaring up during his evening class and was interfering with his sleep. Tr. 525. On March 14, Pope's pain was the same and his sleep was somewhat improved. Tr. 520. Pope admitted that he was still using marijuana in the hopes of weaning himself off of Valium as a sleep aid. Tr. 520. Dr. Morris noted that Pope's chronic pain condition was complicated by persisting use of marijuana despite advice to the contrary. Tr. 523. On April 18, 2008, Pope reported that his pain had worsened. Tr. 515. He tried avoiding marijuana for two weeks, but restarted because he would frequently wake at 3:00 AM and not be able to return to

sleep. *Id.* Dr. Morris reiterated his unwillingness to prescribe methadone if Pope continued to use marijuana and instructed Pope to stop. Tr. 518.

In mid-2008, Pope's pain and sleep seemed to improve. On May 16, 2008, Pope reported improvement in his pain and sleep and stated that he had not been using marijuana since his sleep improved. Tr. 510. Two months later, on July 29, 2008, Pope's sleep had improved and he planned to start school full-time in the fall. Tr. 505-506. Indeed, Pope registered for five computer science classes in the fall semester. Tr. 250. On November 5, 2008, Pope had his last appointment with Dr. Morris, who dismissed him because Pope was "unable to comply with the terms of our treatment agreement," apparently a reference to Pope's continued use of marijuana. Tr. 611. On December 3, 2008, Pope had an initial consultation with Dr. Blackburn, his new pain management specialist. Tr. 711-719. Pope reported global body pain above and below the waist that interfered with his sleep. Tr. 713. Dr. Blackburn's records state that Pope was a "farm worker and student." Tr. 716. On January 13, 2009, in a follow-up appointment with Dr. Blackburn, Pope reported that he could walk non-stop for a mile or further. Tr. 706. On January 29, 2009, Pope visited Dr. Tearse, a sleep specialist, and reported that he had been sleeping satisfactorily, getting six hours of sleep on good nights and arising feeling more rested. Tr. 625. Dr. Tearse opined that Pope's insomnia was controlled by Valium and would improve if his pain was further controlled. *Id.* Over the next several months, Pope reported first an increase and then a decrease in pain levels, along with a corresponding improvement in sleep. Tr. 692-704. By April 28, 2009, he estimated his pain at five out of 10, the lowest pain rating in two and a half years, and reported "doing a lot better." Tr. 693.

The next month, on May 20, 2009, Pope underwent a neuropsychological screening assessment with Dr. Northway at the request of Disability Determination Services.  Tr. 647-653. Initially, Dr. Northway noted several inconsistencies in Pope's present reporting: Pope denied ever being in a serious relationship and made no mention of having children, but in Pope's previous evaluation, he reported having a girlfriend for four years and having a son from another relationship.  Tr. 649.  Pope also stated that he was in the midst of a period of poor sleep where he remained awake five nights a week and only slept three to four hours on good nights.  Tr. 650. Dr. Northway noted that medical records suggested Pope had been sleeping reasonably well earlier in the year.  *Id.*  Dr. Northway performed a battery of psychological tests and concluded that:

> current neuropsychological screening testing with Mr. Pope suggests some difficulties with attention, concentration, and mental efficiency with scores falling in the mildly to moderately impaired range.  He also struggled on visual memory tasks with scores falling in the severely impaired range . . . Overall it appears he would have a difficult time maintaining concentration, persistence, and pace and would likely perform significantly slower and less efficiently than his peers.  In addition he will have trouble learning, understanding, and remembering new information presented in the visual modality.

Tr. 652.  Dr. Northway also noted that it was unclear whether Pope's deficits were residual from cognitive problems identified following his motor vehicle accidents in 1999 or were secondary to fatigue, chronic pain, and the side effects from his pain medication.  *Id.*  In summary, Dr. Northway wrote that "[i]n Mr. Pope's current state it is difficult to imagine him being able to accommodate or adjust to any additional stressors or new activities until his sleep problems are adequately addressed.  He will probably continue to function at his current impaired levels."  *Id.*

Following the evaluation with Dr. Northway, Pope continued to report fluctuating pain and sleep problems.  On May 25, 2009, Pope stated that his pain was seven out of 10 and that he

FINDINGS AND RECOMMENDATION- Page 19

"still wakes up after three hours of sleep due to fibromyalgia pain." Tr. 690. The next month, he

reported pain of five out of 10 to Dr. Blackburn, and the next day told Dr. Allcott, a general

practitioner, that he was having sleep issues and felt that "the cycle that happened [four] years

ago [is] happening again." Tr. 687, 723. On July 20, 2009, Pope reported pain at five out of 10,

Tr. 683. On August 4, 2009, he returned to Dr. Allcott to discuss the possibility of a referral to

OHSU Neurology to determine if another diagnosis besides fibromyalgia could account for all of

his symptoms. Tr. 721.

## II.   Hearing Testimony

At his first hearing before the ALJ on February 24, 2009, Pope highlighted the effects of

pain, lack of sleep, and migraine headahces.  Pain in Pope's shoulders, neck, back, and hips

forced him to take five minute breaks from sitting every hour and half while at school.  Tr. 58.

Also, normal household activities like washing dishes, doing laundry and keeping  the yard

picked up did not aggravate his pain as long as he paced himself. Tr. 64-65.  Mowing the lawn,

however, would aggravate his pain. Tr. 64. Also, Pope had not ridden his quad in two years or

gone wakeboarding since last summer because of pain.  Tr. 66.

Pope also testified that he has trouble concentrating from lack of sleep.  Tr. 59.   Pope

explained that he had been taking Diazepam (Valium) for several years, and denied that any

adjustments or changes have allowed him to sleep better.  Tr. 59-60.  Pope stated that he uses

medical marijuana prescribed by the "[Com]passion Center" for help with both pain and sleep.

Tr. 62.  Pope testified that he would get good sleep three to four times a week for about five to

six hours, with pain preventing him from falling asleep and staying asleep.  Tr. 60.  On bad

nights, Pope testified that he would sleep two to three hours.  Tr. 61.  After bad nights, Pope said

that he experiences anxiety and trouble concentrating on things his teacher is explaining. Tr. 61. Pope explained that he could perform his old job at the mill operating a machine on days he had slept, but that it would be hard to do that work with a lack of sleep. Tr. 63.

Pope also described getting severe migraine headaches one to two times per week. Tr. 67. The migraines last six to eight hours and require Pope to stay in his bedroom with the lights off and "just deal with it." *Id.* No one has prescribed Pope medications to prevent his migraine headaches. Tr. 69.

At the second hearing, on August 13, 2009, Pope testified that he was having trouble in school during the Spring term because of difficulties with sleep and concentration. Tr. 39. Pope finished his single class, with accommodations from the teacher. Tr. 39. Pope also explained that although his sleep was going well when he visited Dr. Tearse in January 2009, it started worsening in February 2009, going from about six hours a night to little or no sleep. Tr. 39. Pope testified that he did not return to the sleep clinic because he had not made an appointment there. Tr. 40. Pope admitted that if his sleep was under control, his body pain would be better and he could go back to work. Tr. 44. Pope also discussed a note in medical records from December 3, 2008 stating that he was doing farm work, explaining that he occasionally helps his aunt by putting food into a feeder for her cows. Tr. 40-41.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Pope did not engage in substantial gainful activity since his alleged onset date of April 28, 2006. Tr. 15. At the second step, the ALJ found that Pope's fibromyalgia and dysthymia disorder were "severe" medical impairments for purposes of the Act. Tr. 15. At the

third step, the ALJ found that none of Pope's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 115-17. The ALJ therefore assessed Pope as having the residual functional capacity to "perform light work as defined in 20 CFR 404.1567(b) with the ability to understand and remember simple instructions, carry out simple, routine tasks, to have limited contact with the public, and to perform simple, repetitive unskilled duties alone." Tr. 17. At the fourth step of the five-step process, the ALJ found in light of his RFC that Pope was unable to perform his past relevant work. Tr. 25. At the fifth step, the ALJ found in light of Pope's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform. Tr. 26. Relying on the testimony of a vocational expert, the ALJ cited examples of jobs that Pope could perform despite the limitations listed in his RFC, such as small products assembly worker, packing line worker, and marker II. Tr. 26. Based on the finding that Pope could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act from April 28, 2006 through the date of the decision, August 25, 2009. Tr. 26-27.

ANALYSIS

Pope argues that the Commissioner erred by not finding his impairment of chronic insomnia to be severe, by rejecting the opinion of Pope's pain specialist Dr. Morris, by discrediting the opinions of examining psychologist Dr. Northway, by rejecting his own testimony and his mother's testimony, and by relying on testimony from a vocational expert that was inconsistent with the *Dictionary of Occupational Titles*. The Commissioner concedes that

FINDINGS AND RECOMMENDATION- Page 22

the ALJ's decision contained errors warranting a remand– without specifying which ones– but

argues that further proceedings are necessary for the Commissioner to assess Pope's alleged

insomnia and determine how that condition effects Pope's residual functional capacity.  I analyze

each of the alleged errors in the ALJ's decision and determine that none requires remand for an

immediate award of benefits. Ultimately, one outstanding issue remains for the Commissioner to

address: whether Pope can perform any job in the national economy given his pain and insomnia-

related cognitive limitations.   Accordingly, I reverse and remand for further proceedings.

I.      **ALJ Decision**

    A.      **Chronic Insomnia as Severe Impairment**

       An ALJ can find an impairment "not severe only if the evidence establishes a slight

abnormality that has no more than a minimal effect on an individual's ability to work." *Smolen v.*

*Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citations omitted).  Before an ALJ can conclude that

a claimant's symptoms affect the claimant's ability to work, "medical signs or laboratory findings

. . . must show the existence of a medical impairment." 20 C.F.R. § 404.1529(b); *see also*

*Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005).  An ALJ's erroneous finding that an

impairment is non-severe constitutes harmless error, however, if the ALJ resolves step two in the

claimant's favor and properly considers limitations imposed by the impairment at other steps of

the sequential process.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (ALJ's failure to

discuss the claimant's impairment in the severity determination was harmless where the ALJ

considered any limitations posed by the impairment in the analysis of whether the claimant could

perform past relevant work).

Here, in step two of the disability analysis the ALJ improperly excluded insomnia from the list of Pope's severe impairments. Pope's sleep specialist Dr. Irbe first diagnosed Pope with acute onset insomnia following a sleep consultation on October 4, 2005. Tr. 306-308. Dr. Irbe modified that diagnosis to chronic sleep onset insomnia following an overnight diagnostic sleep study on January 15, 2007. Tr. 574 (Sleep architecture in sleep study showed sleep onset insomnia); 575 ("Sleep onset insomnia was indicated by prolonged sleep onset latency, normal volume of REM sleep, paucity of deep sleep and 16% of stage 1 NREM sleep."). Moreover, even though the ALJ resolved step two in Pope's favor, his error was not harmless because he failed to consider limitations imposed by Pope's insomnia in any detail in later steps of the disability analysis. On remand, the ALJ should find Pope's insomnia to be a severe impairment and consider limitations imposed by that impairment in evaluating Pope's residual functional capacity.

### B.        Opinion of Treating Physician Dr. Morris

In the face of conflicting medical evidence, the ALJ must determine credibility and resolve the conflict. *Thomas*, 278 F.3d at 956-957. "Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships." *Carmickle*, 533 F.3d at 1164. An ALJ , however, may reject a treating or examining physician's uncontradicted medical opinion based on "clear and convincing reasons" supported by substantial evidence in the record. *Id.* (citation omitted). If other evidence in the record contradicts the opinion, an ALJ may reject the opinion only "by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r Soc.*

*Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th Cir. 1988).

The ALJ must consider not only the treating physician's clinical findings and interpretation of test results but also his subjective judgments. *Lester*, 81 F.3d 821, 833 (9th Cir. 1995). Several factors determine the weight the ALJ should give to a physician opinion, including the length of the treatment relationship and frequency of examination, the amount of evidence that supports the opinion, the consistency of the medical opinion with the record as a whole and the physician's area of specialty. *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)).

Here, Dr. Morris, a pain management specialist who treated Pope monthly for almost two years, first opined that Pope was "completely disabled by his symptoms" following Pope's initial consultation. Tr. 402, 403. Dr. Morris frequently reiterated that opinion in subsequent progress notes. *See, e.g.*, Tr. 491, 497, 501. Evidence from a non-examining state medical consultant contradicts Dr. Morris' opinion. Tr. 469 (state consultant Dr. Westfall found Dr. Morris' opinion inconsistent with the totality of the evidence which showed strong somatic overlays). Thus, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence to reject Dr. Morris' opinion. The ALJ failed to do so. Instead, he implicitly rejected Dr. Morris' opinion by stating that "the issue of disability is one reserved for the commissioner." Tr. 25 (citing SSR 96-5p). In this regard, the ALJ's decision applied an improper legal standard, since the ALJ may not reject a medical opinion simply because it

concerns a legal issue reserved for the Commissioner. *See* S.S.R. No. 96-5p, 1996 WL 374183 ("adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner."). Although the ALJ apparently rejected Dr. Morris' opinion concerning Pope's disability, he gave "significant weight to Dr. Morris' opinion that the claimant would improve in 18 months and could consider returning to his job . . . ." Tr. 22. The Commissioner now acknowledges that the ALJ erred in this regard as well. (D.'s Br., #25, at 9.)

### C.       Opinion of Examining Physician Dr. Northway

As with treating physicians, the controverted opinion of a non-treating, examining psychologist may only be rejected for specific, legitimate reasons. *See Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). Here, psychologist David Northway, Ph.D. examined Pope in 2006 and 2009. After the 2009 evaluation, Dr. Northway wrote that Pope's attention, concentration, and mental efficiency were mildly to moderately impaired, his visual memory was severely impaired, and that he had "a difficult time maintaining concentration, persistence and pace and would likely perform significantly slower and less efficiently than his peers." Tr. 652. Dr. Northway also opined that "[i]n Mr. Pope's current state it is difficult to imagine him being able to accommodate or adjust to any additional stressors or new activities until his sleep problems are adequately addressed. He will probably continue to function at his current impaired levels." *Id.* Dr. Northway's opinion was partially controverted by a non-examining state agency psychologist, Joshua Boyd, Psy.D., who summarized Dr. Northway's findings but stated that "[w]hile sleep and fatigue would reasonably impact mental processes, [Pope] retains adequate

FINDINGS AND RECOMMENDATION- Page 26

cognitions [sic] for [simple routine tasks]." Tr. 671.

Although the ALJ wrote that he gave considerable weight to Dr. Northway's neuropsychological assessment of Pope's residual functional capacity, Tr. 24, he failed to incorporate the limitations Dr. Northway observed into his evaluation of Pope's residual functional capacity. Such limitations are properly considered by the ALJ when determining residual functional capacity. *See Robbins v. Social Sec. Admin.*, 466, F.3d 880, 883 (9th Cir. 2006) (in making findings about claimant's residual functional capacity, ALJ must consider objective medical facts, diagnoses and medical opinions). Instead, the ALJ adopted the residual functional capacity assessment from Dr. Boyd, implicitly disregarding Dr. Northway's opinion, without providing specific and legitimate reasons for disregarding Dr. Northway's opinions. Tr. 17.

**D.      Pope's Testimony**

Once a claimant produces medical evidence of an underlying impairment, an ALJ may not reject the claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of the impairment. *Robbins v. Soc. Sec. Admin.* 466 F.3d 880, 883 (9th Cir. 2006); *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Unless the record has affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must state specifically the facts in the record that lead to her conclusion. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). In other words, the ALJ's credibility findings must be

sufficiently specific to "permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Tommasetti*, 533 F.3d at 1039 (citation omitted).

Here, the ALJ gave three reasons for rejecting Pope's testimony. First, the ALJ disbelieved Pope's statements about the severity of his insomnia. The ALJ noted that Pope told Dr. Tearse he was sleeping satisfactorily in January 2009 and had not returned for further sleep consultations since that visit. Tr. 18. Thus, the ALJ reasoned that Pope's recent complaints of insomnia were not credible because Pope had failed to seek further care from sleep specialists. *Id.* An ALJ may permissibly discount a claimant's credibility "if the level or frequency of treatment is inconsistent with the level of complaints." S.S.R. No. 96-7p, 1996 WL 374186. Before drawing that negative inference from a claimant's failure to seek medical treatment, however, the ALJ must first consider "any explanations that the individual may provide, or other information in the case record, that may *explain* infrequent or irregular medical visits or failure to seek medical treatment." *Id.* (emphasis added).

There are several such explanations for Pope's conduct. Foremost, Dr. Irbe's recommended behavior modifications and medication trials never ameliorated Pope's insomnia, giving Pope little incentive to return frequently for additional sleep consultation. Tr. 500 (Dr. Morris writes that Pope "still has severe insomnia at night, however, despite Dr. Irbe's best efforts, has not found a successful remedy"); Tr. 573 (Dr. Irbe notes that "I doubt that a trial with different sleeping agents at this point would improve his sleep pattern"); Tr. 576 (Dr. Irbe encourages Pope to try Provigil again and observes that "through Dr. Morris he has tried most all anti-depressants including Wellbutrin, Effexor, Trazodone, and Amitriphtyline, all of which he

failed."). Indeed, SSR 96-7p recognizes that this sort of explanation for failure to seek treatment may enhance a claimant's credibility. S.S.R. No. 96-7p, 1996 WL 374186 ("The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications. . . . The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual."). Moreover, Pope's failure to make a new appointment for sleep consultation before his August 2009 hearing was reasonable, given that he was on a schedule of only yearly visits with Dr. Tearse. Tr. 625 (progress note from January 2009 visit with Dr. Tearse stating that Pope "returns for an *annual follow-up* and has been sleeping satisfactorily") (emphasis added). Finally, Pope's most recent pain management specialist, whom he visited much more frequently than his sleep specialist, also treated Pope's sleep complaints. Tr. 713 (Dr. Blackburn's initial consultation on December 3, 2008 notes that Pope's pain interferes with his ability to sleep); Tr. 695 (Dr. Blackburn's progress note on April 21, 2009 states that Pope "sleeps longer but still wakes up due to pain"); (Dr. Blackburn's progress note on May 26, 2009 states that Pope "[s]till wakes up after three hours of sleep due to fibromyalgia pain"). In sum, Pope's failure to follow up frequently with sleep specialists was not a specific, clear and convincing reason for the ALJ to discredit Pope's symptom testimony.

The ALJ's second rationale for rejecting Pope's testimony was also flawed. The ALJ asserted that Pope "lately alleged significant sleep problems" after his alleged neurocognitive deficits and physical limitations "proved not to be supportable." Tr. 18. To the contrary, Pope first complained of significant sleep problems at approximately the same time he reported other

symptoms, during the second half of 2005. Tr. 396, 393, 285, 391, 389, 306-307. Moreover, while Pope's insomnia waxed and waned in severity over the next four years, it apparently remained an ongoing concern and the subject of medical intervention. *See, e.g.,* Tr. 303 (sleep improved with Valium in November 2005); Tr. 372-373 (reported no sleep for six days in a row in July 2006); Tr. 346 (sleep and pain improved with Rozerem in September 2006); Tr. 428 (sleep and pain worsened in February 2007); Tr. 478 (sleep improved with Suboxone in May 2007); Tr. 554 (sleep worsened, perhaps due to weather change, in September 2007); Tr. 535-549 (sleep improved with increased methadone doses in October-December 2007); Tr. 525-534 (sleep worsened because of pain in January and February 2008); Tr. 510 (sleep improved with tizanidine in May 2008); Tr. 625 (sleep satisfactory in January 2009); Tr. 650 (period of poor sleep in May 2009). The ALJ's insinuation that Pope fabricated his sleep complaints after other conditions were disproved finds no support in the record.

Finally, the ALJ reasoned that Pope's insomnia allegations "are also contradicted by the medical evidence." Tr. 18 (citing all of Pope's medical records from his two sleep specialists, Dr. Irbe and Dr. Tearse). This justification is insufficiently specific to discredit Pope's testimony. *See Tommasetti*, 533 F.3d at 1039. Further, the sleep clinic records cited by the ALJ comport with Pope's general reports of difficulty going to sleep, non-refreshing sleep, and frequent awakenings, even if they do not definitely confirm Pope's reports of occasional week-long episodes of near-total sleeplessness. *See, e.g.*, Tr. 574 (Dr. Irbe confirms diagnosis of sleep onset insomnia and lack of deep sleep through an overnight sleep study). Overall, the ALJ improperly rejected Pope's subjective complaints about the severity of his insomnia.

E.        Lay Witness Testimony of Pope's Mother

"[A]n ALJ must consider lay witness testimony concerning a claimant's ability to work."

*Stout*, 454 F.3d at 1053.  The ALJ cannot disregard lay witness testimony "without comment."

*Id.*.  Rather, if an ALJ disregards the testimony of a lay witness, the ALJ must provide specific

reasons that are germane to each witness.  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).

Moreover, "where an ALJ's error lies in a failure to properly discuss competent lay testimony

favorable to the claimant, a reviewing court cannot consider the error harmless unless it can

confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have

reached a different disability determination." *Robbins*, 466 F.3d at 885 (citation omitted).

Here, the ALJ briefly acknowledged Pope's mother's testimony that Pope's insomnia

severely affected his functional ability.  Tr. 18.  The ALJ, however, silently disregarded that

testimony without providing any germane reasons for doing so.  Given that Pope's mother

observed him on a daily basis, knew his condition both before and during his illness, and

described Pope's substantial physical and cognitive limitations, the ALJ's error cannot be

considered harmless.

F.        **Vocational Expert Testimony**

Although evidence provided by a vocational expert generally should be consistent with

the *Dictionary of Occupational Titles*, neither source automatically prevails when there is a

conflict.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).  The ALJ must first

determine whether a conflict exists.  *Id.*  If a conflict exists, "the ALJ must then determine

whether the vocational expert's explanation for the conflict is reasonable and whether a basis

exists for relying on the expert rather than the *Dictionary of Occupational Titles*." *Id.; see also*

*Johnson*, 60 F.3d. at 1435 ("[A]n ALJ may rely on expert testimony which contradicts the DOT,

but only insofar as the record contains persuasive evidence to support the deviation.").

Pope argues that the ALJ accepted vocational expert (VE) testimony in conflict with the

*Dictionary of Occupational Titles* (DOT) without any justification to support that deviation.

Indeed, the ALJ found that the VE's testimony was consistent with the DOT, and therefore, that

Pope could perform the jobs of assembler of small products, packing line worker, and marker II.

Tr. 26.  The VE's testimony, however, conflicts with the DOT.  The ALJ found that Pope only

had the ability to understand and remember simple instructions and carry out simple routine

tasks.  All three jobs identified by the VE require level two reasoning development on the scale

of General Educational Development (GED).  DOT, §§7,9.  Level two reasoning development, in

turn, requires the ability to "apply commonsense understanding to carry out *detailed* but

uninvolved written or oral instructions."  DOT, App. C § III (emphasis added).  Thus, the ALJ

relied on VE's testimony contradicting the DOT and improperly failed provided any reason to

justify that deviation.

## II.        Remedy

The Ninth Circuit has clarified the standard for determining whether to remand for

further proceedings or an award of benefits: "the district court should credit evidence that was

rejected during the administrative process and remand for an immediate award of benefits if (1)

the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no

outstanding issues that must be resolved before a determination of disability can be made; and (3)

it is clear from the record that the ALJ would be required to find the claimant disabled were such

evidence credited." *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004) (citing *Harman v.*

*Apfel,* 211 F.3d 1172, 1174, 1178 (9th Cir. 2000)). Even if there is no vocational expert

testimony stating that a person with the claimant's precise limitations is disabled, remand is not

always required. *Id.* at 595. Rather, "in the unusual case in which it is clear from the record that

the claimant is unable to perform gainful employment in the national economy, even though the

vocational expert did not address the precise work limitations established by the improperly

discredited testimony, remand for an immediate award of benefits is appropriate." *Id.* Remand

for further administrative proceedings is appropriate, however, "if enhancement of the record

would be useful." *Id.* at 539.

　　　　Here, the Commissioner admits that the first element of the foregoing test is satisfied,

but asserts that the other two elements are not, since the ALJ must address the outstanding issue

of the extent to which Pope's insomnia affects his functioning before making a disability

determination. I agree. The issue of the effect of Pope's insomnia on his ability to work remains

outstanding. Specifically, the ALJ must reassess Pope's residual functional capacity, considering

objective medical facts found in the record, medical diagnoses and opinions from Dr. Morris and

Dr. Northway, and subjective evidence of symptoms provided by Pope and his mother.[4] *See*

---

[4] The Commissioner provides a series of citations to the record concerning Pope's daily activities in an attempt to suggest that Pope was not particularly impacted by his insomnia. Although the ALJ must ultimately weigh these factors in the context of the entire record, I note that many of these citations are not particularly pertinent. Pope's physical activities– such as tinkering on cars, occasionally feeding his aunt's cows, wakeboarding, riding ATVs, walking, and fishing– do not necessarily indicate Pope possessed sufficient cognitive abilities to sustain full-time work. Moreover, the record indicates that Pope had not participated in any of the more

*Robbins v. Social Sec. Admin.*, 466, F.3d 880, 883 (9th Cir. 2006).  The ALJ must then redetermine whether Pope can perform any gainful employment in the national economy, since the vocational expert did not have the opportunity during previous hearings to address the full range of Pope's functional limitations.

Pope argues that crediting the improperly rejected testimony, particularly Dr. Northway's opinion, necessarily establishes his disability.  I disagree.  Dr. Northway found Pope to have mild to moderate impairments in some areas and severe impairments in others, causing him to perform more slowly and less efficiently than peers.  Dr. Northway also noted that if Pope's insomnia remained unsolved, Pope would not be able to adjust to new stressors or activities and would continue to function at his "current impaired levels."  Dr. Northway's evaluation, however, does not conclusively resolve whether Pope's "current impaired levels" of cognition would preclude *all* sustained competitive work.

Nor does the brief colloquy between Pope's counsel and the ALJ at the end of the August 2009 hearing establish that fact, as Pope contends.  Tr. 45-46.  It is hard to discern from the hearing transcript what exactly the ALJ meant by repeating "right" and "yeah" in response to

---

strenuous activities in some time.  Tr. 66 (Pope testified in February 2009 that he had not ridden his quad in two years or gone wakeboarding since last summer);Tr. 650 (reporting to Dr. Northway in May 2009 that he had not done BMX biking, body surfing, four wheeling, wake boarding, and driving quads recently); Tr. 482 (last evidence of ATV riding was reported ATV accident in May 2007).  Additionally, Pope's educational activities do not necessarily undermine his contention that he could not return to work.  *See Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992) (attending college part time is not the equivalent of being able to engage in substantial gainful activity).  Similarly, Pope's ability to use a computer for one to two hours per day does not imply that he retained the capacity for sustained work over a much longer period.

FINDINGS AND RECOMMENDATION- Page 34

counsel's closing remarks.    Perhaps the ALJ was signaling his agreement with Pope's counsel that Dr. Northway's opinion, if credited, conclusively established Pope's inability to perform any competitive work.  Alternatively, the ALJ might have merely been demonstrating that he understood Pope's theory of the case and would take it into consideration.  In fact, this seems the more likely explanation, since the ALJ closed the hearing stating: "Well, I've got your letter here as exhibit 20 [arguing that Dr. Northway's opinion is sufficient to find Pope disabled] and, you know, I figure that's probably where your thrust was going to go.  Okay.  All right.  Well, Mr. Pope, we're done." Tr. 46.

Additionally, Pope's reliance on Dr. Morris' opinion that Pope was "completely disabled" by his symptoms is somewhat misplaced.  Dr. Morris' conclusion could have been based on self-report, review of prior medical records, diagnostic evidence, or some combination of those– it is impossible to tell, especially since Dr. Morris recorded that opinion following his initial consultation with Pope.  On this ambiguous record, Dr. Morris' opinion does not provide compelling evidence of Pope's disability.  In sum, this case does not present a situation where the claimant's entitlement to disability is clear even without further proceedings.  *See Benecke*, 379 F.3d at 595-96.

Although this case does not satisfy the three-part test described above for mandatory crediting of improperly rejected testimony and award of benefits, I nevertheless apply the credit-as-true rule to Pope's symptom testimony.  The Ninth Circuit has, at times, credited a claimant's improperly rejected symptom testimony as true even where remand is necessary to determine disability.  *See Vasquez v. Astrue*, 572 F.3d 586, 594 (9th Cir. 2009) (where claimant was of

advanced age and her claim was six years old, court instructed ALJ to accept the claimant's

symptom testimony as true in determining whether she was entitled to benefits on remand);

*Hammock v. Bowen*, 879 F.2d 498, 504 (9th Cir.1989) (instructing ALJ to credit plaintiff's pain

testimony on remand where plaintiff was of advanced age and had experienced a severe delay in

her application).  The Ninth Circuit explained in *Vasquez* that the "the purpose of the

credit-as-true rule is to discourage ALJs from reaching a conclusion about a claimant's status

first, and then attempting to justify it by ignoring any evidence in the record that suggests an

opposite result." *Vasquez*, 572 F.3d at 594.  The Court also observed that "[b]y requiring the

ALJ to specify any factors discrediting a claimant at the first opportunity," the rule ensures that

the ALJ carefully assesses the claimant's testimony and prevents unnecessary duplication in the

administrative process.  *Id.*  At least one district court in the Ninth Circuit has applied this

approach where a plaintiff's claim was delayed but the plaintiff was not of advanced age.  *See*

*Ladner v. Astrue*, No. 2:09-cv-00253-PMP-LRL, 2010 WL 3118589, at *10 (D. Nev. June 30,

2010) (crediting plaintiff's symptom testimony as true "[i]n the interest of moving this nearly six

year old claim forward").

Here, where Pope's claim is nearly five years old and the ALJ failed to articulate

proper reasons to discredit Pope's testimony when he had the opportunity initially, Pope's

symptom testimony should be credited.  Upon remand, the ALJ must address the single

outstanding issue in this case by reformulating Pope's residual functional capacity and by

eliciting testimony from a vocational expert to determine what work in the national economy

Pope can perform, if any, in light of his pain and insomnia-related cognitive impairments.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion to remand (#25) should be granted and the Commissioner's decision should be reversed and remanded for further proceedings consistent with this opinion.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 20th day of May, 2011.

Honorable Paul Papak
United States Magistrate Judge